the 3d article, and stands solitary and disconnected with any other claim, in or out of the treat}’.
The lessor of the plaintiff’s claim is very different; h\s is a life estate to himself, and a reservation in fee simple to the children; his claim is founded on, and supported by divers considerations, as the head of an Indian family, as having a residence on the east side of the Mississippi river on lands surrendered, &c. to the United States, and as having a wish to become a citizen of the United States; these, with the registry of his name in the office of the Cherokee agent, constitute his title under the 8th article of the treaty of 1817, recognized, continued and extended by the 2d and 7th articles of the treaty of 1819. Nothing therefore appears in the treaties themselves, showing that the one of these claims destroyed the other, or that there is any inconsistency in their both standing as valid claims in law. They are different in kind, and dependent on different articles of the treaties between which there is no connection. The 3d article of the treaty of 1819, which gives the reservation to the wife, has no connection with the 2d and 7th articles of the same treaty, and the 8th article of the treaty of 1817, which gives the reservation to the husband.
But the treaty is travelled out of in the charge of the cótirt, and the fact of the wife’s gift in fee is brought forward and presented asa bar to the claim of the lessor of the plaintiff. If we c onfine our view to the treaty, the connection of husband and wife no where appears; the gift here is to Margaret Morgan, without notice of the civil relation of wife, and it is only by evidence dehors the treaty, that we learn the Margaret Morgan therein mentioned, sustains this relation to the plaintiff in error. If the civil union of these parlies, and other matters personal, could be looked at through any other medium than the provisions and stipulations of the treaty itself, the. information so acquired would have a tendency to strengthen and support the lessor of the plaintiff’s claim, instead of weakening, or as it is argued, wholly destroying it.
The witness, Lowry, tells us, that the lessor of the *453 plaintiff in error, was appointed by the Cherokee Nation, as one of their delegates to make what is called, the Calhoun treaty, in 1819, and in that capacity he had a considerable agency in bringing about the treaty; and from the printed copy of the treaty, (see 2 Scott’s Revisal, 839,) we find his name signed the first of the Cherokee delegation in the execution of it. These circumstances and particulars would, if we could depart from the face of the treaty itself, and indulge in conjecture as to the motives and causes producing the gift to Mrs Morgan, induce the .belief that the contracting parties to the treaty, taking into consideration the very prominent and important services of the husband in effecting the treaty, intended them to be acknowledged and rewarded by the gratuity to the wife; and it being given to her by the name of Margaret Morgan, without noticing her civil relation, further shows the gratuity to be cumulative, and a thing separate, distinct and apart from the legal claim of the husband under the treaties, which he held in common with any other head of an Indian family.
' Two other points are urged by the defendant’s counsel, as repulsive of the plaintiff in error’s claim. One of them is, that under the circumstances of the case, the lessor of the plaintifi in error was not the head of an Indian family, within the meaning of the treaties of 1817 and 1819.
These circumstances, by the testimony of Mr Lowry, are, that the lessor of the plaintiff in error, was married to his wife Margaret, an Indian girl, before the Creek war; that after this intermarriage, he resided with his wife in what is now the ceded territory, at the time of Jackson’s treaty at the Cherokee agency, north east of the Hiwassee river; that he continued to live near the Hiwassee, in what is now the ceded territory, until shortly before Calhoun’s treaty, when he was appointed by the Cherokee Nation, as one of their delegates, to make what is called Calhoun’s treaty, in 1819; that he went on to Washington City in that service, and had considerable agency in bringing about Calhoun’s treaty. *456 family to Knoxville in the fall of 1818, and his continuance* or that of his family, there, until December 1819, when he removed to his reservation at the mouth of Citico creek. "When we consider the nature and probable cause of his removal to Knoxville with his family, it will not amount to a change of domicil, being only for a special and temporary purpose. John Lowry says, “he (to wit, the lessor of the plaintiff,) continued to live near the Hiwassee river, in the ceded territory, until shortly before the Calhoun treaty, when he was appointed by the Cherokee nation as one of their delegates to make the treaty; and during his absence to Washington City, where said treaty was made, he left his family in Knoxville. And after this, in August 1819, he commenced his improvement at the mouth of Citico creek, where he claimed his reservation, and moved in December following. The fair inference from this testimony is, that the lessor of the plaintiff brought his family to Knoxville to remain there during his absence at Washington, with a view of returning to his improvement on the ceded territory. There is no evidence of an intention to abandon or relinquish his domicil, upon his removal to Knoxville, or afterwards. In effectuating the treaty at Washington, it became necessary, it seems,' for this improvement to be sacrificed and given to Lewis Ross. This derangement of his affairs may, in the absence of other proof to the contrary, account for the length of his stay at Knoxville, together with the necessary consumption of time in making preparations at a new place, for the reception and comfort of his family..
Again: suppose the removal of the lessor of the plaintiff with his family to Knoxville in the fall of 1818, and residence there of his family until after the treaty was made, the lessor of the plaintiff being in the meantime a ■Cherokee delegate, and acting as such at Washington City in making the treaty, and afterwards returning with his family to the ceded territory, and settling therein on an improvement, which he did in December 1819; and let it be admitted further, that this absence amounted to a non-residence under the treaty in him as the head of an In *457 dian family; yet it ought not to injure him upon common law principles, for he was absent in the service of his country, the Cherokee nation. Thus Littleton, sec. 439,-says, ‘‘ In the same manner it seemeth, when a man is out of the realm, if such a one be disseissed when he is in the service of the king, and the disseissor dieth sei-sed, &c. the disseissee being in the king’s service, that such descent should not hurt the disseissee, but for that he could not make continual claim, it seems to them, that when he cometh into England, he may enter upon the heir of the disseissor, &c. For such a man shall reverse an outlawry pronounced against him during the time he was in the king’s service, &c. and therefore a multi for-tiori he shall have aid and indemnity in the other case,” &c. Many other books and cases also might be cited, showing and illustrating the same principle, which I forbear to do, believing it is unnecessary, the above being an authority of the highest order.
The verdict in this case must be set aside, and the judgment rendered thereon reversed, and the cause sent down to the court from whence it came, for a new trial to be had therein, according to the law as held in this opinion.
Catron, J. dissented; for his reasons, see the latter part of Pathkiller’s case, ante 407.
Judgment reversed.